UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| XCEL SOFTWARE, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 04-11581 (REK) |
| | : | |
| v. | : | |
| | : | |
| DEPOT AMERICA, INC., | : | |
| | : | |
| Defendant. | : | |
| | x | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

I.      INTRODUCTION ................................................................................ 1

II.     STATEMENT OF PERTINENT FACTS ........................................... 3

        A.    Depot America's Business ........................................................ 3

        B.    Depot America Needs, And Xcel Agreed To Provide,
              Software Support ..................................................................... 4

        C.    Depot America Has Not Breached Its License ......................... 5

        D.    Xcel Disables ServiceWorks, Forces Depot America
              Employees To Click "Yes" To A Clickwrap, And Then
              Sues Depot America for Breach of the Clickwrap .................... 7

        E.    Xcel Threatens To Halt Needed Support ................................. 9

        F.    Irreparable Injury To Depot America ..................................... 9

        G.    Xcel Interferes With The Depot America/Canon U.S.A.
              Business Relationship ........................................................... 10

III.    A TRO IS NEEDED TO MAINTAIN THE *STATUS QUO*
        AND PREVENT IRREPARABLE INJURY TO DEPOT
        AMERICA ............................................................................................ 11

        A.    The Standard For Injunctive Relief ....................................... 11

        B.    Denial Of A Temporary Injunction Will Cause Depot
              America Irreparable Injury .................................................. 12

              1.    Depot America's Business Depends On
                    ServiceWorks ................................................................ 12

              2.    The Injury From Xcel Halting Support Would
                    Be Irreparable ............................................................. 13

        C.    The Injury To Depot America Outweighs Any Harm
              Which Might Be Inflicted On Xcel From An Injunction ....... 13

        D.    Depot America Is Highly Likely To Succeed On The
              Merits .................................................................................... 14

              1.    Xcel Is Obligated To Provide Support ......................... 14

ii

2.    Depot America Has Not Breached Any
Enforceable Agreement ..........................................................15

a.    Absence Of A Written Agreement - U.C.C...............................15

b.    Depot America Did Not Breach The
February 2002 Clickwrap ............................................15

c.    No Alleged Breach Was Material ..............................17

d.    Depot America's Conduct Is Protected  Under
The Copyright Statute .............................................18

e.    The July 7, 2004 Clickwrap Is Not Enforceable........................18

E.    Xcel Should Be Enjoined From Further Interference
Interference With Depot America's Contracts .................................20

IV.    CONCLUSION ........................................................................21

iii

# TABLE OF AUTHORITIES

**Page(s)**

*Aldrich v. Bay State Construction Co.*,
     186 Mass. 489 (1904)...........................................................................................16

*Aymes v. Bonnelli*,
     47 F.3d 23 (2d Cir. 1995)...............................................................................17, 18

*Baystate Technologies v. Bentley Systems*,
     946 F. Supp. 1079 (D. Mass. 1997) ...................................................................16

*Beacon Looms, Inc. v. S. Lichtenberg & Co.*,
     552 F. Supp. 1305 (S.D.N.Y. 1982)...................................................................20

*CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*,
     48 F.3d 618 (1st Cir. 1995), aff'd, 97 F.3d 1504 (1st Cir. 1996) ......................11

*Foresight Resources, Inc. v. Pfortmiller*,
     719 F. Supp. 1006 (D. Kan. 1989) .....................................................................18

*International Underwater Contractors, Inc. v.*
     *New England Telegraph & Telegraph Co.*,
     8 Mass. App. Ct. 340 (1979) ..............................................................................19

*Matos v. Clinton Sch. District*,
     367 F.3d 68 (1st Cir. 2004) ................................................................................10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*,
     839 F. Supp. 68 (D. Me. 1993) ..........................................................................11

*Merrimack Valley National Bank v. Baird*,
     372 Mass. 721 (1977).........................................................................................16

*O'Connell Management Co. v. Carlyle-XIII Managers*,
     765 F. Supp. 779 (D. Mass. 1991) .....................................................................17

*Planned Parenthood League v. Bellotti*,
     641 F.2d 1006 (1st Cir. 1981) ............................................................................11

*Reed Tech. & Info Servs. v. Future Vision Holding, Inc.*,
     No. 95-6900, U.S. Dist. LEXIS 111 (Mass. Super. Ct. July 6, 1998) ...............15

iv

*Teitelbaum v. Hallmark Cards, Inc.*,
  25 Mass. App. Ct. 555 (1988) ...................................................................15

*United States v. United Mine Workers*,
  330 U.S. 258 (1947) ...................................................................................11

*Vargas-Figueroa v. Saldana*,
  826 F.2d 160 (1st Cir. 1987) .....................................................................11

*VMark Software v. EMC Corp.*,
  37 Mass. App. Ct. 610 (1994) ...................................................................15

*Wright v. Commonwealth*,
  351 Mass. 666 (1967) ............................................................................14, 16

*Zapatha v. Dairy Mart*,
  381 Mass. 284 (1980) .................................................................................15

## Statutes, Rules & Other Authorities

17 U.S.C. § 117 .............................................................................................17, 18

Restatement (Second) of Contracts § 241 (1981) ...........................................17

2 E. Allan Farnsworth,
  Farnsworth on Contracts § 8.16 (2d ed. 1998) ........................................1, 17

2 E. Allan Farnsworth,
  Farnsworth on Contracts, § 4.16 (2d ed 1998) ...........................................19

## I. __INTRODUCTION__

Defendant Depot America, Inc. ("Depot America") submits this memorandum in support of its motion for a temporary restraining order and a preliminary injunction.

Depot America sells and repairs printers. It operates a $40 million business with more than 200 employees. For at least ten years, Depot America has used the ServiceWorks software from plaintiff Xcel Software, Inc. ("Xcel") for its ordering and shipments. Xcel has provided the technical support necessary to correct errors in the software. To ensure Xcel's support, Depot America signed a separate 2004 agreement. Now that a dispute has arisen, Xcel threatens to pull support for the software so the program will develop errors and eventually fail. If not enjoined from stopping support, Xcel will cause severe and irreparable injury that will threaten the operation of Depot America's business.

Depot America asks the Court to maintain the *status quo* while this dispute is being litigated. A temporary restraining order will halt irreparable and potentially disastrous injury to Depot America's business from Xcel stopping critical support for the software before this matter may be heard on a preliminary injunction motion. A preliminary injunction order will then be needed to maintain the *status quo* during the pendency of this suit.

Xcel's ostensible reason for threatening to withhold technical support is that Depot America has breached two "clickwrap" licenses that it put up, unannounced, on the computer screen. No one at Depot America ever saw the first alleged clickwrap agreement, but, in any event, it has not been breached. Xcel's actions in providing the second clickwrap are so egregious that Depot America asserts duress and claims of computer trespass. On July 6, 2004, Xcel disabled the licensed ServiceWorks software with Depot America's customer data so Depot America's employees were effectively locked out of their business unless they clicked "yes" to the new clickwrap. Xcel's disablement of the software and installation of a new clickwrap was done without Depot America's knowledge or assent. Neither clickwrap was negotiated or genuinely accepted by Depot America.

Depot America will establish that it has a substantial likelihood of success on the merits relating to Xcel's assertion of breach:

1.    The "per incident support" agreement for 2004 is a stand-alone agreement, unaffected by any clickwraps.

2.    Depot America has not breached the February 2002 clickwrap.  Depot America did not reverse engineer, decompile, disassemble, or modify the ServiceWorks software.  Rather, a Depot America employee temporarily added a list of important customers to its own database file so that it could generate monthly reports to those customers.  The same employee also viewed how Depot America's own data was formatted its own database file so that Depot America could access its data.  This data file, which must be contrasted with the ServiceWorks software, is completely open to Depot America.  Depot America did not even use the ServiceWorks software in connection with these actions, let alone reverse engineer or modify the ServiceWorks software.

3.    Even if one could argue that there had been a breach, it was not material and therefore not a basis for terminating the license.  In fact, the list from Depot America was in the database only from June 28 to July 1, 2004 — four days.  It had been removed before Xcel abruptly noticed termination on July 14, 2004.

4.    The second "clickwrap" agreement Xcel refers to was a patent attempt to trick Depot America's users into accepting a new agreement so Xcel could argue it was breached.  Although Depot America had already paid for licenses to use ServiceWorks, based on a small modification, Xcel provided a "clickwrap" on July 6, 2004, that would change many terms of the agreement.  The second clickwrap is ineffective because it was not signed by Depot America as the February 2002 clickwrap requires.  Moreover, it was forced upon Depot America without additional consideration on an "accept it or stop running your business" basis.  To ensure that Depot America's users would click "yes," Xcel disabled the then-existing version so that Depot America's employees could not use the prior software that Depot America had licensed.  This

2

"clickwrap" was a mere trick, not a binding agreement.  Indeed, Xcel alleges that this agreement was breached by conduct arising <u>before</u> the agreement was even presented to Depot America.

The temporary restraining order and preliminary injunction are also needed to stop Xcel's self-help by interfering with Depot America's business relationships.  Xcel has already notified Canon U.S.A. that Depot America had violated the license agreement and had to stop using the ServiceWorks software.  As a result of this interference, Canon has demanded that Depot America provide alternative software as a contingency.  These threats to customers have caused Depot America further irreparable injury.

## II.    <u>STATEMENT OF PERTINENT FACTS</u>

In support of the temporary restraining order, Depot America has submitted sworn statements that establish the following facts:

### A.    <u>Depot America's Business</u>

1.    Since its founding in 1988, Depot America has grown into a market-leading reseller of printer service parts and solutions for laser, inkjet, dot matrix, and point-of-sale printers.  Depot America has about 200 full-time employees and 30-40 flex force employees. Depot America does about $40 million in business per year.  (Costa Decl. ¶ 2.)

2.    Depot America's success is based on its ability to fill orders with an accuracy of 99% or better, its guaranteed same-day shipment of any in-stock part prior to 7:30 p.m., a parts inventory of about $5 million, and a proven track record in service support. (Costa Decl. ¶ 3.)  Obviously, Depot America relies heavily on its computer systems to meet these stringent requirements.  (*Id*. ¶ 5.)

3.    Since about 1989, Depot America's business has come to depend on use of Xcel's ServiceWorks software.  (Costa Decl. ¶ 5.)  As a regular part of its use of the ServiceWorks software, Depot America inputs information relating to its customer information, products ordered, quantities, costs, and credit information.  The ServiceWorks software then stores this information in a Microsoft SQL database file.  (*Id*. ¶ 7.)  If the software stopped working, Depot America's business would be greatly impaired and Depot America's ability to take orders and make shipments could be halted.  (*Id*. ¶ 6.)

3

4.     Should Depot America's access to this essential data be curtailed for any time, Depot America's business and goodwill would be seriously impaired and potentially destroyed. (Costa Decl. ¶ 7.)

**B.**     **Depot America Needs, And Xcel Agreed To Provide, Software Support**

5.     The ServiceWorks software requires regular support in order to fix errors that arise during its use.  (Costa Decl. ¶ 6.)  Indeed, Depot America routinely encounters defects and errors in the ServiceWorks program.  (Gorman Decl. ¶ 7(b).)  Only Xcel has the knowledge of the program and the access to the source code necessary to fix those errors.  (Costa Decl. ¶ 6.)

6.     Accordingly, without this regular support, there is a serious risk that the ServiceWorks software would stop working.  (Costa Decl. ¶ 6.)   If these types of defects went unfixed, Depot America would be left without a centralized program to process, store, and access its data and the results would be catastrophic.  (Gorman Decl. ¶ 7(b).)

7.     In fact, two defects in the ServiceWorks software — or at least problems that Depot America could not fix on its own — have arisen since the litigation was filed less than a month ago.  On July 21, 2004, the ServiceWorks software was unable to process customer account balance records.  Xcel provided support and fixed the problem.  On August 17, 2004, one user's copy of the ServiceWorks software began crashing whenever the user tried to generate a report of customers and discrepancies between the products they bought and the products they returned.  (Gorman Decl. ¶ 7(b).)   Because there are no meaningful user manuals or "help" features in the ServiceWorks software, Depot America is completely dependant on Xcel when it comes to understanding why the ServiceWorks program is behaving incorrectly or contrary to expectations.  (*Id.* ¶ 7(c).)

8.     Accordingly, Depot America has paid through 2004 for, and Xcel agreed to provide, support for the software and modifications to improve the software at established hourly rates.  (Costa Decl. ¶ 9.)  The support fees paid by Depot America to Xcel are in addition to more than $100,000 in license fees.  (*Id.* ¶ 8.)

4

9.      At the end of 2003, Xcel sent Depot America proposals to renew a ServiceWorks maintenance plan by which Xcel was obligated to provide enhancement and support services.  In an e-mail from Xcel dated December 30, 2003, Xcel recommended that Depot America buy the 2004 enhancement plan, which included an obligation by Xcel to provide "per incident support." (Leonard Decl. ¶ 7; Exh. A.)  In January 2004, Xcel invoiced Depot America for "ServiceWorks annual enhancement plan renewal" for 2004 in the amount of $23,600.  Depot America paid that amount obligating Xcel to provide "per incident support" through the end of 2004.  (Leonard Decl. Exh. B; ¶ 8.)

C.      **Depot America Has Not Breached Its License**

10.     Beginning in early 2002, Depot America paid Xcel in excess of $200,000 to switch Depot America's implementation of ServiceWorks to a new program that uses the Microsoft SQL program.  In addition, Depot America has paid more than $100,000 to Xcel for one-time user fees to license the new version of the ServiceWorks program since February 2002. (Leonard Decl. ¶ 3; Costa Decl. ¶ 8.)

11.     Xcel has alleged that in February 2002, it provided a first "clickwrap" agreement for the Microsoft SQL-based ServiceWorks program.  A copy of the agreement is attached as Exhibit E to the Kennedy declaration.  (Kennedy Decl. Exh. E.)  A "clickwrap" agreement is provided by a software company to numerous individual users of the software so they have to click "yes" before using the program.  Usually a clickwrap is needed where it is impractical for the software owner to negotiate with each user of off-the-shelf or over the Internet programs. Depot America and its employees are unaware of any employee who saw the alleged February 2002 clickwrap and accepted it.  (Leonard Decl. ¶ 4.)

12.     The February 2002 "clickwrap" provides in pertinent part:

You may not reverse engineer, decompile, or disassemble the Licensed Software, transfer the Licensed Software to any third party, or use the Licensed Software to perform services for any third party.  Any use or dealings with the Licensed Software other than as this Agreement expressly provides automatically terminates this Agreement.

5

(Kennedy Decl. Exh. E.)   The "Licensed Software" is the software product known as ServiceWorks.  (*Id.*)  This "clickwrap" also provides:  "Modifications of this Agreement made other than by a writing signed by Xcel and You will be of no effect."  (*Id.* at 2.)

13.    As part of the effort to depend more on its own independent software capabilities, in July 2004, Depot America employees used and wrote software that created monthly reports to preferred customers (known as "authorized service provider" or "ASP") of Lexmark, who is in turn one of Depot America's largest customers.  (Gorman Decl. ¶ 10.)  Xcel was asked to provide an estimate of its costs to write such software.  Upon receiving the Xcel's estimate, Depot America determined that it could perform the work itself for less.  (*Id.* ¶¶ 11-12.)

14.    Depot America's customer data is stored by ServiceWorks into a Microsoft SQL Server database file.  The Microsoft SQL Server database program is licensed by Microsoft to Depot America, and the file containing Depot America's data is called "DEPOT.MDF," and the file resides on Depot America's computer system.  (Gorman Decl. ¶¶ 14, 15.)

15.    Depot America has complete and open access to data stored in the Microsoft SQL database file.  (Gorman Decl. ¶¶ 15.)  To prepare the Lexmark reports, Mr. Thoennes of Depot America needed to match the list of Lexmark ASPs, who were Depot America's customers, with the services and products they received during the prior month.  On June 28, 2004, he added single list (called a "table") of the ASPs to the Microsoft SQL Server database file that contained the data about Depot America's customers.  That way, Mr. Thoennes' program was able to match the ASPs to their purchases.  (Thoennes Decl. ¶¶ 2, 3.)

16.    Depot America did not need nor use any portion of the ServiceWorks program to prepare Lexmark Monthly ASP Reports.  The reports are based solely on Depot America's data relating to its customers' monthly purchases stored in a file stored on Depot America's computers.  Information can be added or removed from the database file by many different types of programs licensed to Depot America, of which ServiceWorks is just one.  (*Id.* ¶ 4.)  Moreover, Mr. Thoennes did not modify a single table in the database file used by the ServiceWorks program.  (*Id.* ¶ 5.)

6

17.     Once the monthly report had been generated for June 2004, Mr. Thoennes deleted the list from the Microsoft SQL server database file because it was no longer needed and would quickly be out of date.  (Thoennes Decl. ¶ 6.)  In short, the list of the Lexmark ASPs from the Microsoft SQL server database file existed a mere four days, from June 28 to July 1, 2004.  (*Id*.)  Mr. Thoennes recalls deleting the table before July 7, 2004, when Xcel presented the unannounced second "clickwrap" agreement.  (*Id*. ¶ 8.)

18.     Moreover, Depot America has not "reverse engineered" the ServiceWorks software via the use of diagrams.  Depot America has complete and open access to the data stored in its Microsoft SQL database file.  (Gorman Decl. ¶¶ 15.)  In connection with his duties of working with Depot America's electronic data, a Depot America employee did use non-ServiceWorks software licensed to Depot America to view diagrams of the tables containing Depot America's customer, vendor, and product data that was stored in the Microsoft SQL file residing on Depot America's computers.  (Thoennes Decl. ¶ 11.)  The Microsoft SQL Server database had been configured by Xcel to allow Depot America's administrators to see anything related to how its data was formatted in the database file.  In this regard, all of the information was in "plain sight" to Depot America.  (*Id*. ¶ 14)  The Depot America employee did not create diagrams of the ServiceWorks software.  (*Id*. ¶ 12-13.)

**D.     Xcel Disables ServiceWorks, Forces Depot America Employees To Click "Yes" To A Clickwrap, And Then Sues Depot America for Breach of the Clickwrap**

19.     On July 6, 2004, apparently suspecting that Depot America's employees had engaged in conduct that he disapproved of, Mr. DiPilato of Xcel disabled the ServiceWorks software so that it would not work unless an employee clicked "yes" to a new "clickwrap".

20.     Specifically, on July 6, 2004, all Depot America employees that tried to run the ServiceWorks program were presented with message boxes stating that a new release of ServiceWorks was available and subject to a "clickwrap."  The new release was actually the same ServiceWorks software but with a slight $300 modification.  (Gorman Decl. ¶ 19.)  Xcel never told Depot America about the clickwrap prior to modifying Depot America's systems to require it.  (*Id*. ¶ 19)

ID # 404006v01/2585-8/ 08.19.2004

21.     A copy of this new "clickwrap" (Kennedy Decl. Exh. F) contains many material changes from the two-page first "clickwrap" agreement from February 2002.  The second "clickwrap" agreement covers the same ServiceWorks software, but was not "signed by" Depot America, as would be required to modify the first clickwrap.  (*See Id.* )

22.     Depot America's employees' only choice was to click "yes" or not use the ServiceWorks program at all; Xcel had configured Depot America's systems so that every attempt to run the ServiceWorks program resulted in a demand that the employee say "yes" to the clickwrap.  The employees were not provided with the option of rejecting the second clickwrap and using the unmodified ServiceWorks software that they had been using prior to July 6.  Rather, no matter how many times the user clicked "no," the ServiceWorks software that they had been using to date would not run.  (Gorman Decl. ¶¶ 20-26.)

23.     Accordingly, Depot America's employees had no choice but to click "yes" or be denied access to Depot America's data, *i.e.,* the very data they needed to perform their jobs and run the business.  (Gorman Decl. ¶¶ 25-26.)

24.     On July 14, 2004, Depot America received a facsimile from Xcel's attorneys, saying that the license to use the ServiceWorks software was being terminated immediately.  Since Depot America's business depends on use of the ServiceWorks software under a license that was paid, stopping use would mean halting business and having no meaningful use of Depot America's own customer data.  Xcel did not say what specific activities violated the alleged agreements.  Xcel said it would file suit unless Depot America agreed to certain demands by July 21, 2004, but then secretly filed suit on July 16, 2004 — five days earlier. (Costa Decl. ¶ 11.)

25.     When Joseph Costa, Depot America's President, called Joe DiPilato, Xcel's President, to find out what the issues were, he was told that Depot America should pay $150,000 for infringing Xcel's copyright.  (Costa Decl. ¶ 12.)

8

26.     Depot America cannot change over to a different software system except through great effort, cost, and time.  For Depot America to replace ServiceWorks would take as long as six to nine months.  (Costa Decl. ¶ 13.)

**E.     Xcel Threatens To Halt Needed Support**

27.     On July 20, 2004, Xcel and DiPilato informed Depot America that Xcel intended to discontinue technical support or assistance to Depot America in connection with its usage of the ServiceWorks program.  As part of its communication to us, Xcel explicitly recognized that the ServiceWorks program is likely to fail in its performance without this regular maintenance. Depot America is willing to continue to pay for support.  Xcel has been providing support for at least ten years, and Depot America has paid Xcel at an agreed hourly rate for support.  (Costa Decl. ¶ 14.)

28.     On July 21, 2004, immediately after Xcel had withdrawn support, Depot America encountered a defect with the ServiceWorks software which required support.  Depot America contacted DiPilato and Xcel to request support help.  Xcel did not respond as it was required by the support agreement.  (Leonard Decl. ¶ 11; Costa Decl. ¶ 15.)

29.     On the morning of July 22, 2004, Xcel notified Depot America that Xcel would agree to recontinue its support.  Depot America's attorneys spent the entire day of July 22, 2004, working out the terms of such an agreement.  At the end of the day, Mr. DiPilato changed his mind and refused to continue his support obligation.  On July 23, 2004, following a negotiation to settle this matter, Xcel agreed to recommence its support obligations through August 12, 2004. (Costa Decl. ¶¶ 16, 17.)

**F.     Irreparable Injury To Depot America**

30.     Any cessation by Xcel in its obligations to provide continuing technical support for the ServiceWorks program will result in severe and irreparable injury to Depot America, its business, and its reputation with customers.  Depot America promotes efficient and prompt service and repairs for all orders coming in.  Without technical support which is required on nearly a weekly basis, the ServiceWorks program could fail.  If the program should fail it would severely and irreparably injure Depot America's business which depends on the accuracy and

9

speed of filling parts orders and providing support services. The amount of business lost or goodwill impaired cannot be determined, but would be severe. (Costa Decl. ¶ 18.)

31.    A recovery of damages from Xcel for lost business would also be unavailable. Xcel is not a large company. With Depot America's $40 million business at stake, if the ServiceWorks program were to be impaired by an absence of support, there is no reasonable prospect that Xcel could pay damages approaching the amount of damage Depot America would suffer. (Costa Decl. ¶ 19.)

**G.    Xcel Interferes With The**
        **Depot America/Canon U.S.A. Business Relationship**

32.    Canon U.S.A. is an important customer of Depot America. Depot America also has a contractual relationship with Canon U.S.A., Inc. whereby Depot America supports Canon's printers and the return, repair, and replacement of those printers under Canon's warranty. This contractual relationship between Depot America and Canon is a valuable business relationship and contract. Depot America introduced DiPilato and Xcel to Canon U.S.A. in connection with Depot America's business with Canon. Xcel and DiPilato are aware that Depot America has a long-standing business relationship and agreement with Canon to provide services for Canon printers. (Leonard Decl. ¶ 14.)

33.    On July 20, 2004, DiPilato and Xcel attempted to interfere with Depot America's agreement with Canon by informing Canon that Depot America had violated its license, the agreement has terminated and that Depot America "has to stop using the ServiceWorks software" and return all copies to Xcel. (Leonard Decl. Exh. D.)

34.    DiPilato's and Xcel's improper statements have tortiously interfered with Depot America's business relationship with Canon because the ServiceWorks software is important to the conduct of Depot America's business with Canon. As a result of Xcel and DiPilato's interference, Canon has demanded that Depot America provide a contingency software to conduct business with Canon. (Leonard Decl. ¶ 16.)

10

## III.   A TRO IS NEEDED TO MAINTAIN THE *STATUS QUO* AND PREVENT IRREPARABLE INJURY TO DEPOT AMERICA

### A.   The Standard For Injunctive Relief

The temporary restraining order and preliminary injunction are needed for their traditional purpose of preserving the *status quo* in which Xcel continues to support the licensed software during the pendency of this action.  *Matos v. Clinton Sch. Dist*., 367 F.3d 68, 72 (1st Cir. 2004) ("The aim of a preliminary injunction 'is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs,'" (quoting *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc*., 48 F.3d 618, 620 (1st Cir. 1995), aff'd, 97 F.3d 1504 (1st Cir. 1996).); *see also United States v. United Mine Workers*, 330 U.S. 258, 293 (1947) (district court has the power to preserve current arrangement while the parties are heard on motion for preliminary injunction).

A preliminary injunction is appropriate where it can be shown:

(1) movant will suffer irreparable injury if the injunction is not granted;

(2) that such injury outweighs any harm which granting injunctive relief would inflict on the nonmoving party;

(3) that movant has established a likelihood of success on the merits; and

(4) that the public interest will not be adversely affected by the granting of the injunction.

*Vargas-Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir. 1987); *Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981).  The same four-factor test applies to temporary restraining orders.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 70 (D. Me. 1993) (finding former employee's release of proprietary information constituted irreparable injury warranting temporary restraining order).

Depot America is not requesting that the Court compel the performance of a personal services contract.  Requiring that the qualified engineers at Xcel continue the support services during the pendency of this suit does not force any particular Xcel employee to provide the support obligation of the company.  Moreover, Xcel will be enjoined from stopping the duties Xcel has unambiguously defined in its own statement of support services:

Within the support-plan applicable number of hours of receiving a report of a verifiable and reproducible Error and verifying that such an Error is present,

11

> (i) initiate work to develop an Error Correction, (ii) use all reasonable diligence to complete development of such Error Correction, (iii) upon completion, provide User at least a "temporary fix" consisting of sufficient programming and operating instructions to enable User to implement the Error Correction, and (iv) include the Error Correction in all subsequent releases of the Product(s).

(Leonard Decl. Exh. C.)  Thus, the Court need not define Xcel's support duties to provide the temporary injunction.

**B.    Denial Of A Temporary Injunction Will Cause Depot America Irreparable Injury**

      **1.    Depot America's Business Depends On ServiceWorks**

Depot America has a $40 million business which relies on its license to use the ServiceWorks software for ordering, shipping, repairing, and other functions for printers. Technical support is needed for the ServiceWorks software to remain operational.  Xcel recognizes this by providing support services under agreement.  Since Xcel alone has access to the source code, it alone can repair errors.

Depot America has reasonably come to depend on the ServiceWorks software.  In early 2002, Depot America funded a significant effort to modify the ServiceWorks program to use Microsoft SQL platform.  Depot America paid Xcel in excess of $200,000 to make this switch. Depot America then paid more than $100,000 to Xcel for more than 100 user licenses for the ServiceWorks program.

On top of these payments, Depot America has also paid Xcel for plans to provide "per-incident support" to correct errors, and has paid Xcel the hourly rate for its support services.

Moreover, Depot America constantly encounters errors and problems in the ServiceWorks program that it cannot fix itself.  Since the litigation began, two new have defects occurred, one relating to Depot America's ability to manage customer account balances and another related to the Depot America's ability to inform customers of discrepancies in their product returns.  (Gorman Decl. ¶ 7(b).)  Although Xcel fixed the first one, the second remains unaddressed because Xcel has refused to provide any more support until this case is resolved or ordered to do so.

12

In addition, Depot America does not have access to any significant user manuals or information regarding the operation of ServiceWorks.  Accordingly, when problems arise, it has always called Xcel for assistance and it continues to need that assistance. (Gorman Decl. ¶ 7(c).)

### 2.    The Injury From Xcel Halting Support Would Be Irreparable

Xcel's acts in halting support would cause the ServiceWorks software to develop errors which eventually would leave Depot America without a centralized program to process, store and access its data.  (Gorman Decl. ¶ 7.)  Depot America depends on its accuracy and speed of filling orders to satisfy its customers.  The ServiceWorks software is prone to errors which require regular support.  (Costa Decl. ¶ 6.)  Should the program malfunction, Depot America's business and goodwill are at risk of severe irreparable injury.  The amount of business lost or the goodwill impaired cannot be determined, but it would be severe.  (*Id*. ¶ 18.)  Depot America would lose customers, lose new business, and have its hard-earned goodwill impaired because the software system that controls its ordering and shipments will become impaired and eventually fail.  The injury is irreparable in a second way because there is no prospect that Xcel will be able to pay damages for the loss of Depot America's substantial $40 million business at the end of this case.  (Costa Decl. ¶ 19.)

### C.    The Injury To Depot America Outweighs Any Harm Which Might Be Inflicted On Xcel From An Injunction

The injury to Depot America would be severe.  At a minimum, Depot America would suffer significant, but immeasurable impairment of its goodwill.  When the ServiceWorks program for orders, shipments, and repairs eventually fails, Depot America's reputation and entire business would be at risk.

In contrast, the harm to Xcel from an injunction, if any, would be quite small.  An injunction in this case requires that Xcel do what it has agreed to do and can continue doing with little difficulty.  First, Xcel would need to continue the support obligations that it has been providing for more than ten years.  Xcel's support policy delineates precisely what is required to

13

provide these support obligations. Depot America will continue to pay Xcel its hourly rate in providing the support. Second, the injunction would require that Xcel and Mr. DiPilato stop interfering with Depot America's contracts and stop misrepresenting that Depot America must halt all use of the ServiceWorks software. Thus, the injunction would not harm Xcel.

> **D.     Depot America Is Highly Likely To Succeed On The Merits**
> > **1.     Xcel Is Obligated To Provide Support**

Beginning in February 2002, Depot America began the costly process of having the ServiceWorks software used for tracking orders, invoices, shipping and repair of printers and other equipment converted over to the Microsoft SQL platform. Depot America paid hundreds of thousands of dollars to Xcel to switch over to the new program and to license the use of the software by more than 100 users at Depot America. (*See* Costa Decl. ¶ 8; Leonard Decl. ¶ 3.)

Depot America has always been aware that regular technical support is required to fix errors. (Leonard Decl. ¶ 5.) At the end of 2003, Xcel outlined plans to continue its support of the ServiceWorks program. In an e-mail of December 30, 2003, Mr. DiPilato of Xcel outlined an enhancement plan which included an obligation of "per incident support" for the software. (*See* Leonard Decl. Exh. A; ¶ 7.) On or about January 9, 2004, Depot America accepted the enhancement plan containing Xcel's "per incident support" obligation through the end of 2004, and paid $23,600 for that support. (*Id.* Exh. B; ¶ 8.) In the description of its "software support policy," Xcel provided what its support obligations entail:

> Within the support-plan applicable number of hours of receiving a report of a verifiable and reproducible Error and verifying that such an Error is present, (i) initiate work to develop an Error Correction, (ii) use all reasonable diligence to complete development of such Error Correction, (iii) upon completion, provide User at least a "temporary fix" consisting of sufficient programming and operating instructions to enable User to implement the Error Correction, and (iv) include the Error Correction in all subsequent releases of the Product(s).

(*Id.* Exh. C, at 3.)

There are no limitations in the enhancement contract, formed by the offer of September 30, 2003 (*Id.* Exh. A) and the acceptance and payment of January 9, 2004 (*Id.* Exh. B), which permit Xcel to withdraw its support because it contends that Depot America breached another agreement relating to its use of the ServiceWorks software. Since the contract

14

was drafted by Xcel alone, any doubtful language would be construed against the author. *Wright v. Commonwealth*, 351 Mass. 666, 673 (1967).

      **2.**      **Depot America Has Not Breached Any Enforceable Agreement**
         **a.**      **Absence Of A Written Agreement - U.C.C.**

Xcel contends that the parties agreed to a February 2002 "clickwrap;" Depot America is unaware of any employee having accepted the clickwrap.  (*Id.* ¶ 4.)  In fact, in 2002, Depot America had spent many hundreds of thousands of dollars to have the ServiceWorks program provided in the Microsoft SQL platform and to license the use of that program.  If Xcel provided this "clickwrap" after Depot America had paid for the work and licensed the software, the clickwrap would lack consideration.

If there is no written contract covering Depot America's license, the terms of the parties' agreement would be filled in by the Uniform Commercial Code.  *See VMark Software v. EMC Corp.*, 37 Mass. App. Ct. 610, 611 n.1 (1994);  *Reed Tech. & Info Servs. v. Future Vision Holding, Inc.*, No. 95-6900, U.S. Dist. LEXIS 111, at *12-14 (Mass. Super. Ct. July 6, 1998). Under U.C.C. § 2-309, reasonable notification of termination must be received, and reasonableness is measured "in terms of the ability of the party affected by the termination to obtain a substitute arrangement."  *Teitelbaum v. Hallmark Cards, Inc.*, 25 Mass. App. Ct. 555, 560-61 (1988); *see also Zapatha v. Dairy Mart*, 381 Mass. 284, 293 (1980) (franchise agreement providing 90 days notice is reasonable).  Moreover, the U.C.C. does not provide any prohibition against reverse engineering, decompiling or disassembling of software.  Thus, Xcel could not even assert a breach.

         **b.**      **Depot America Did Not Breach The February 2002 Clickwrap**

Depot America has not breached the terms of the February 2002 clickwrap.  That is the only possible written agreement in force.  That clickwrap provides:

> You may not reverse engineer, decompile, or disassemble the Licensed Software, transfer the Licensed Software to any third party, or use the Licensed Software to perform services for any third party.  Any use or dealings with the Licensed Software other than as this Agreement expressly provides automatically terminates this Agreement.

(Kennedy Decl. Exh. E at 1.)

15

Depot America did not reverse engineer, decompile, or disassemble the ServiceWorks software. The conduct by Mr. Thoennes to which Xcel has objected involved merely viewing the fields where customer names were stored in the Microsoft SQL database and then adding a list of the names of Lexmark's authorized service providers who were customers of Depot America so an independently developed program by Depot America could obtain the purchases during the prior month by those particular Lexmark customers. (Thoennes Decl. ¶ 3.) Depot America did not use the ServiceWorks program to prepare these reports; Depot America did not modify any tables used by the ServiceWorks programs. Mr. Thoennes did not reverse engineer, decompile, or disassemble the software by using a tool to take the object code and "engineer" the program in reverse to discover the source code. Mr. Thoennes merely looked at headings which are openly stored in the database and available to him and other Depot America users. (Thoennes Decl. ¶¶ 12-13.)

The February 2002 clickwrap clearly says that one may not reverse engineer, decompile, or disassemble the "Licensed Software." In contast, Depot America's employees looked only at the database, in which Depot America's customer data is stored, not the ServiceWorks software. The database is not considered part of the protected elements of a computer program. In *Baystate Technologies v. Bentley Systems*, 946 F. Supp. 1079 (D. Mass. 1997), the court held that the data structures of a computer program are not "constituent, original elements of the [computer] program," and held that such matters as the organization of the data structure and the words, names and abbreviations within the structures are not entitled to copyright protection along with the software. *Id.* at 1087-88. Moreover, the unenforceable July 7, 2004 clickwrap draws distinctions between the "XCEL software ServiceWorks" and "associated SQL databases," its crafty yet transparent attempt to define both as simply "Software" notwithstanding (*See* Kennedy Decl. Exh. F at 1.) Thus, even the exceptionally weak argument that Depot America in some way modified the database provides no likely success in establishing breach of the February 2002 clickwrap directed to the ServiceWorks software.

16

Were Xcel to argue that "reverse engineering" should be broader, the law of Massachusetts under which the February 2002 clickwrap agreement is to be construed would have that construction interpreted against Xcel's position.

> As a general rule, a writing is construed against the author of the doubtful language, *Wright v. Commonwealth*, 351 Mass 666, 673 (1967), if the circumstances surrounding its use and the ordinary meaning of the words do not indicate the intended meaning of the language. *Aldrich v. Bay State Constr. Co.*, 186 Mass. 489, 491 (1904). The author of the ambiguous term is held to any reasonable interpretation attributed to that term which is relied on by the other party.

*Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721 (1977).

### c.    No Alleged Breach Was Material, And All Were Cured

Even if Xcel's argument that there was a breach of the February 2002 clickwrap had merit, Xcel would face the additional hurdle in this matter of establishing that this very technical and strained argument relating to breach established a material breach justifying termination of the contract. It is hornbook law that when a party to a contract commits a material breach, the non-breacher has the option of terminating the contract. But in the case of a non-material breach, the termination option is not open to the non-breacher. *See* 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.16 at 495-96 (2d ed. 1998). *O'Connell Management Co. v. Carlyle-XIII Managers*, 765 F. Supp. 779, 783 (D. Mass. 1991) held that only a material breach excuses the other party from performance under the contract. For determining materiality, the court looked to the five factors set forth in the Restatement (Second) of Contracts § 241 (1981), which include the likelihood that the party failing to perform will cure his failure. *Id.*

In this case, Depot America cured any failure almost immediately. The list which had been placed in the database was there for a mere four days, and removed prior to Xcel's termination notice. The diagrams of Depot America's database file merely represent information readily discernable from the file and can be deleted from the database. Depot America has made it clear to Xcel that any and all conduct that Xcel has objected to has been or could be corrected, and Depot America will provide a certification of correction. Moreover, the alleged breach in the present case was certainly minor and did not go to the essence of the agreement.

ID # 404006v01/2585-8/ 08.19.2004

**d.     Depot America's Conduct Is Protected
Under The Copyright Statute**

Depot America merely added a table made a modification to its own database file (and did not change a single table used by ServiceWorks to do so).  That conduct is protected under the copyright statute because Depot America (1) owns a copy of the software and certainly the database file, and (2) created the modification as part of "an essential step in the utilization" of the software and database file.  *See* 17 U.S.C. § 117.

Depot America owns its copy of the software and the database file, satisfying the first prong of § 117.  For over a decade, Xcel provided versions of the software to support Depot America's databases with no written license agreement, creating a presumption that Depot America owns a copy of the relevant software and database.  *See Aymes v. Bonnelli*, 47 F.3d 23, 25 (2d Cir. 1995).  Xcel purported to include a click-wrap agreement with its software in 2002, but that agreement is completely silent as to ownership of the database file.

As to the second prong, Depot America adapted the database file as necessary for its essential use the software.  Adding features to meet internal business needs is such a permitted adaptation.  *See Aymes*, 47 F3d at 26-27; *Foresight Resources, Inc. v. Pfortmiller*, 719 F. Supp. 1006, 1010 (D. Kan. 1989).  The addition of "features to the program that were not present at the time of rightful acquisition" was one of bases relied upon by Congress in the passage of § 117 of the Copyright Act.  *Aymes*, 47 F.3d at 26-27.  Depot America's conduct — the addition of a list to its database file to allow the creation of additional database reports necessary to its business — falls squarely in the purposes protected by § 117.

**e.     The July 7, 2004 Clickwrap Is Not Enforceable**

Likely understanding that Depot America's conduct did not constitute a violation of the February 2002 clickwrap, Xcel provided a new, materially different clickwrap on July 7, 2004.  The clickwrap was presented with a $330 modification of the ServiceWorks program which Depot America had been using since February 2002 with numerous earlier modifications from that date.  Depot America had already paid Xcel to provide the modification.  Xcel provided the unannounced clickwrap because it knew Depot America's users  would have to accept it to

18

continue in business.  Xcel provided no option for the user to reject the clickwrap and return to using the ServiceWorks software Depot America had licensed.  (Gorman Decl. ¶¶ 19-26.)

Xcel loaded the new clickwrap with terms it could use to argue that Depot America's prior actions breached the later agreement.  The very next day, Xcel claims to have discovered a violation of the agreement.  (*See* Am. Compl. ¶¶ 32-33.)  The July 7, 2004 clickwrap is void because it constitutes an improper modification of the February 2002 clickwrap.  The July 7, 2004 clickwrap covers the same ServiceWorks software as the February 2002 clickwrap, although it improperly attempts to add the database to the definition of software.  Preceding this new clickwrap was only a minor modification to the program, no more of a basis for a new contract than the many earlier modifications which had been made.  The February 2002 agreement is clear:  "Modifications of this agreement made other than by a writing signed by XCEL and You [Depot America] will be of no effect."  (Kennedy Decl. Exh. E.)  Thus, the new clickwrap was of no effect.

In addition, the July 7, 2004 clickwrap was presented and accepted by individual users under conditions of duress.  The new license offered no additional consideration, except for an insubstantial modification to the ServiceWorks software for which Xcel paid separately.  The new clickwrap gave Depot America the following unacceptable choice: Accept this agreement or lose the use of the ServiceWorks software (for which Depot America had already paid) and the ability to have access to Depot America's customer data in a usable form.  The second clickwrap was merely a device by which Xcel could — the next day — assert that Depot America had breached and announce an immediate termination.

The circumstances under which Depot America obtained acceptance of the second clickwrap fall within the prohibition against duress by threat.  Farnsworth on Contracts, § 4.16:

> The requirements for a showing of duress by threat can be grouped under four headings.  First, there must be a threat.  Second, the threat must be improper.  Third, the threat must induce the victim's manifestation of assent.  Fourth, it must be sufficiently grave to justify the victim's assent.

(*Id*. at 478.)  Xcel clearly made an improper threat that if the second clickwrap were not accepted, Depot America's ability to use the licensed software would be withdrawn.  Xcel

19

followed this up by ensuring that the users at Depot America did not have the ability to say "no" and access the prior ServiceWorks program without the modification. The threat was sufficiently grave to justify the assent by Depot America's users, and apparently did so for the numerous employees needing to perform their jobs with the program that Depot America had been using for at least ten years. The law of Massachusetts recognizes that economic duress will render a contract invalid. *See Int'l Underwater Contractors, Inc. v. New England Tel. & Tel. Co.*, 8 Mass. App. Ct. 340, 342-45 (1979).

> **E.    Xcel Should Be Enjoined From Further**
> **Interference With Depot America's Contracts**

Xcel is not satisfied to have this dispute decided by a Court. Less than a week after claiming that it was terminating Depot America's license, Xcel and Mr. DiPilato went to Canon U.S.A., a significant Depot America customer, and charged that Depot America had to stop using the ServiceWorks software. (Leonard Decl. Exh. D.) By this misrepresentation, Xcel tortiously interfered with Depot America's business relationship with Canon. As a result, Canon has now demanded that Depot America provide contingency software to conduct business with Canon. There certainly has been an impairment of Depot America's relationship with Canon which has resulted in irreparable injury.

In similar circumstances, the Court in *Beacon Looms, Inc. v. S. Lichtenberg & Co.*, 552 F. Supp. 1305 (S.D.N.Y. 1982), enjoined the defendant from stating to prospective customers for plaintiff's product that their purchases would infringe defendant's copyrights because the loss of business from the conduct would be irreparable and able to be ascertained only with great difficulty. *Id.* at 1314. As in the *Beacon Looms* case, Xcel has no legitimate basis for trying self help and irreparably impair Depot America's business while this matter is in litigation.

20

## IV.    **CONCLUSION**

For the reasons stated in this brief and substantiated by affidavits, Depot America respectfully requests that the Court enter (a) a temporary restraining order until the preliminary injunction may be heard, and (b) a preliminary injunction, enjoining Xcel from halting support for the licensed software, and enjoining further interference with Depot America's contractual relationships.

Respectfully submitted,

POSTERNAK BLANKSTEIN & LUND, LLC
John Egan, BBO # 151670
Jennifer L. Finger, BBO #641830
800 Boylston Street
The Prudential Tower
Boston, MA  02199
Tel:    617 973 6100
Fax:    617 367 2315
*Attorneys for Defendant Counterclaim-Plaintiff*
   *Depot America, Inc.*

Dated: August 19, 2004            By:    /s/ John Egan
                                                 John Egan

**OF COUNSEL:**
Charles P. Kennedy
Jeffrey S. Dickey
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel:    908 654 5000
Fax:    908 654 7866

## **CERTIFICATE OF SERVICE**

I, John Egan, certify that I served a copy of the within Memorandum on Sean Ploen, Esquire, Boston Law Group, LLP, 20 Park Plaza, Suite 637, Boston, MA  02116, by first-class mail, postage prepaid, on August 19, 2004.

/s/ John Egan

21

ID # 404006v01/2585-8/ 08.19.2004