IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| XCEL SOFTWARE, INC., | |
| Plaintiff | |
| v. | CIVIL ACTION NO. 04-11581 REK |
| DEPOT AMERICA, INC., | |
| Defendant | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Xcel Software, Inc. ("Xcel") submits this Memorandum in Support of Plaintiff's Motion for Preliminary Injunction, requesting that the Court enjoin Defendant from further use of Plaintiff's software pending the hearing and final determination of this action.

### I. FACTUAL BACKGROUND

Plaintiff Xcel, which is based in Cambridge, Massachusetts, is a computer software company whose primary product is a program called "ServiceWorks." Xcel licenses the ServiceWorks program to hundreds of third parties, including universities, hospitals, government institutions, professional-service firms, and many others. Xcel created the ServiceWorks program in the mid-1980s, and since then Xcel has released multiple versions of the program. ServiceWorks is service- and sales-management software: it manages client and contact information, maintains purchase and sales records, stores and manages business information, and aggregates data concerning

customers. Xcel has obtained several United States copyright registrations to protect the ServiceWorks program, including Registration No. TX 5 747-735 (issued in 2003) and Registration No. TXu 962-907 (issued in 2000). See Exhibit A, a copy of the copyright registration certificates; see also Exhibit B, Affidavit of Joseph DiPilato, ¶¶ 1, 3 and 5 .

A.   **The Parties' Business Relationship And License Agreements**

Xcel first entered into a business relationship with Defendant Depot America, Inc. ("Depot") in or about 1989, when Xcel licensed an early version of ServiceWorks to Depot. During 1992 or 1993, Depot America licensed a second version of the ServiceWorks software for use on a new database platform it had obtained. In connection with both of these early licenses, Xcel also provided Depot with technical support and customized programming services in order to optimize the software for Depot's particular purposes. Exhibit B, Affidavit of Joseph DiPilato, ¶ 6.

In early 2002, Depot adopted another new database platform, and Xcel again granted Depot a license for an updated version of the ServiceWorks program to operate on that platform. On or about February 1, 2002, Xcel and Depot first entered into the "Xcel Software, Inc., User License Agreement" ("Agreement One"), a "clickwrap" license agreement which granted individual Depot employees the right to use the updated version of ServiceWorks. See Exhibit C, a copy of Agreement One. As of July, 2004, Depot had purchased and entered into a total of 115 of the Agreement One licenses from Xcel, and Depot continues to use this version of ServiceWorks today. Id., ¶¶ 7-8.

Agreement One contains the following provision governing Depot's use of the ServiceWorks software:

> You are licensed to use the Licensed Software for your own internal
> business purposes on a single or networked personal computer system and

2

to copy the Licensed Software into any machine-readable or printed form for backup or support of that use....You may not reverse engineer, decompile, or disassemble the Licensed Software, transfer the Licensed Software to any third party, or use the Licensed Software to perform services for any third party. Any use or dealings with the Licensed Software other than as this Agreement expressly provides automatically terminates this Agreement.

From February, 2002 until the present, Xcel has continued to supply Depot with technical support and custom programming services relating to ServiceWorks. Xcel has provided all such services on an hourly-billing basis. In June, 2004, Depot requested that Xcel create a substantial new modification to the ServiceWorks software. Upon completion of the programming work for the modification, and in consideration of the work it had performed, Xcel provided Depot with a second, expanded license agreement which would govern Depot's continued use of the enhanced ServiceWorks software. Xcel delivered the enhancement to Depot on July 6, 2004, and the second license agreement was first entered into by Depot on that date. *Id.*, ¶¶ 9-10.

That second agreement, the "Xcel Software, Inc. Software License Agreement" ("Agreement Two"), was again a "clickwrap" agreement: upon first accessing the enhanced ServiceWorks software, Depot's users were presented with the terms and conditions of the license agreement, and they had to affirmatively consent to those terms before using the enhanced software. As of July 26, at least 112 Depot employees, including its director of information technology, have entered into Agreement Two. *Id.*, ¶ 11. Agreement Two contains the following provision:

> Except as specifically permitted in this Agreement, User shall not...
> (iii) copy (except for archival purposes), distribute, manufacture, adapt, create derivative works of, translate, localize, port or otherwise modify the Software[.]

See Exhibit D, a copy of Agreement Two, § 2.1.

3

### B.    Xcel's Discovery Of Depot's Acts Of Infringement And Breach

From the initiation of the parties' business dealings in the late 1980s, their relationship grew to the point that by early 2004, Depot was paying Xcel approximately $350,000 annually for ServiceWorks licenses, support and customization services. In or about January, 2004, however, Depot hired a new director to oversee its computer and software systems. Almost immediately, the new director made it known that he wanted to reduce the amount of money Depot was paying Xcel. From February, 2004, to the present, Xcel's average monthly bill to Depot declined from approximately $30,000 to about $11,000, and continues to drop. Exhibit B, ¶ 12.

Depot's hiring of the new director appears to have eroded Depot's respect for Xcel's copyright in the ServiceWorks software. For instance, in February, Depot requested that Xcel develop a new ServiceWorks feature which would permit one of Depot's customers (who had no direct relationship with Xcel) to access certain functions of the ServiceWorks software installed on Depot's Web-accessible computer server. After creating and installing the feature, Xcel discovered that Depot, before permitting the third party to access the functions, had removed Xcel's copyright notice from the ServiceWorks software and inserted its own copyright notice. Xcel immediately notified Depot America that it had acted improperly in removing the notice, and Depot restored Xcel's notice. Moreover, Xcel's president, Joseph DiPilato, either has been a party to or has learned secondhand of several instances in which Depot personnel threatened to "crack" the ServiceWorks source code and reverse engineer the ServiceWorks software in order to reduce Depot's reliance on Xcel and reduce the cost of using the software. Depot personnel also threatened to create a new ServiceWorks program by copying the software

and adapting it for their company's own purposes. *Id.*, ¶¶ 13-15.

In June, 2004, Depot also hired a senior software architect who had knowledge of Structured Query Language ("SQL"), a programming language used to retrieve information from and to update computer databases such as the one used by ServiceWorks. Immediately thereafter, Depot requested that Xcel conduct research as to the addition of several complex new database features to Depot's version of ServiceWorks. Xcel performed the research and developed the necessary technical specifications, then provided this information to Depot, expecting to be retained to do the actual programming work of creating the features. Depot instead notified Xcel that it would perform this work itself, and Mr. DiPilato immediately informed Depot that it did not have Xcel's permission to add functionality to the ServiceWorks program. *Id.*, ¶¶ 16-17.

In late June, sensing that Xcel's business relationship with Depot was in jeopardy, and mindful of Depot's earlier threats to copy, reverse engineer, and adapt the ServiceWorks software, Mr. DiPilato traveled to Depot's offices in New Jersey. There, he reminded several Depot executives, including the company's director of information technology, its vice president of sales and marketing, and the new software architect, of Depot's obligation under Agreement One not to modify, copy or reverse engineer the ServiceWorks software. Mr. DiPilato also stated that Depot was permitted to remove, alter, or otherwise modify its own data within the ServiceWorks database, but that the database logic, instructions and program code itself were part of the ServiceWorks software and thus could not be copied or modified in any way. Depot's executives indicated that they understood and accepted those obligations. *Id.*, ¶ 18-19.

After the meeting, Xcel continued to perform its regular maintenance and support services for Depot, and it created and delivered the substantial ServiceWorks modification Depot had requested in June. As noted, on July 6, Depot America accepted the modification and entered into Agreement Two. On July 7, Xcel discovered that Depot America had (1) reverse engineered the ServiceWorks program and (2) also created a derivative work of the program by modifying it as follows: Depot inserted software code for several new features within the ServiceWorks database logic, instructions and program code. *Id.*, ¶ 20-24.

These features, which apparently had been installed on June 30, were the ones for which Xcel had prepared the technical specifications in June. Depot's new SQL programmer had used the technical specifications provided by Xcel to reverse engineer the ServiceWorks software and program the new database features himself. In order to enable these illegal acts, Depot had preliminarily modified the ServiceWorks software to designate the Depot senior software architect as the owner and author of the ServiceWorks database, thus permitting him to modify the program. Absent this modification, this individual would not have had access to the ServiceWorks database logic, instructions and program code. By clandestinely performing this work on its own, Depot avoided having to pay Xcel for the work. *Id.*, ¶¶ 20-24.

Also on July 7, Xcel discovered that Depot, on more than one occasion, also had executed an SQL function which revealed the full structure and logic of the ServiceWorks database. Mr. DiPilato discovered stored diagrams within the ServiceWorks database whose names did not conform to Xcel's naming convention. One of the diagrams, called "All Tables," contained information regarding all existing tables

6

of the ServiceWorks database, including all of the fields in each table, as well as the interrelationships between these fields. Mr. DiPilato also discovered several other stored diagrams that contained information regarding the structure of certain parts of the ServiceWorks database. Again, without granting itself owner-level access authorization, Depot would not have had the capability to create these diagrams or to reveal the structure and logic of the ServiceWorks database. These diagrams, which reveal the ServiceWorks database structure and logic, clearly demonstrate that Depot had reverse-engineered the design of the ServiceWorks database and modified the ServiceWorks software. *Id.*, ¶¶ 27-30.

### C. Xcel's Termination Of The Two License Agreements And Depot's Refusal To Comply

On July 14, 2004, in accord with its rights under Agreement One and Agreement Two, Xcel notified Depot in writing that its license to use the ServiceWorks software was terminated immediately due to the company's breach of Agreement One and its violations of the Copyright Act. To date, Depot has refused to comply with the termination provisions of either Agreement One and Agreement Two. As to termination, Agreement One provides that:

> Any use or dealings with the Licensed Software other than as this Agreement expressly provides automatically terminates this Agreement. This Agreement is effective on the date on which you accept it, as indicated above, and remains in effect until terminated as indicated above or until you terminate it. Upon termination, you shall cease all use of the Licensed Software and permanently delete it from all systems.

Exhibit C, "Terms of License." Depot continues to use the ServiceWorks program and has not deleted it from all systems, as evidenced by the fact that Xcel continued to receive requests from Depot's employees for technical support for the ServiceWorks

software even after Depot's receipt of the termination letter.

Agreement Two provides that in the event of termination, Depot had the following obligations:

> **TERM AND TERMINATION.** Upon termination of this Agreement for any reason, all rights, obligations and licenses of the parties hereunder shall cease, except as follows: [...] (2) User shall have no further right to use the Software and immediately after the termination or expiration date hereof, the User shall deliver to XCEL, at User's expense, all originals and copies of the (i) Software, (ii) Documentation and (iii) Confidential Information in the possession or under the control of User, and User shall certify in writing to XCEL within ten (10) days following termination that it has complied with this Section 8(2) [...].

Exhibit D, § 8. To date, Depot has not complied with any of these obligations: it continues to use the ServiceWorks software, it has not returned the software and other required materials to Xcel, and it has given Xcel no certification of compliance.

In response to Depot's non-compliance with the termination provisions of either Agreement One or Agreement Two, Xcel filed suit. The parties engaged in substantive settlement discussions in late July, but attempts to memorialize even a preliminary settlement agreement failed.

## II.    POINTS AND AUTHORITIES

### A.    The Standard For Grant Of A Preliminary Injunction

In the First Circuit, courts generally use a four-part inquiry in determining whether a preliminary injunction is warranted. "A court may grant a preliminary injunction when the plaintiff will suffer irreparable injury if the injunction is not granted; such injury to the plaintiff outweighs any harm the injunction would inflict on the defendant; the plaintiff exhibits a likelihood of success on the merits; and the public interest will not be adversely affected." Tanel Corp. v. Reebok Int'l., Ltd., 774 F. Supp.

49, 50 (D. Mass. 1990), citing Planned Parenthood League of Massachusetts v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981).

In situations where a plaintiff's request for injunctive relief is based on a claim of copyright infringement, however, special conditions apply. First, injunctive relief is explicitly authorized by the Copyright Act, which states that "Any court having jurisdiction of a civil action arising under this title may...grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). The usual four-part test is modified and the plaintiff's burden is simplified: in copyright cases, "(1) if likelihood of success on the merits is shown, irreparable injury is presumed; (2) the public interest is not a 'genuine' issue because 'it is virtually axiomatic that the public interest can only be served by upholding copyright protections'; and (3) likelihood of success on the merits should 'be placed in the scales when [a Court] weighs the balance of the harms'." Flomerics Ltd. v. Fluid Dynamics Int'l., 880 F. Supp. 60, 61-62 (D. Mass., 1995) (quoting Concrete Machinery Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600 (1st Cir., 1988) (issuing preliminary injunction in copyright infringement action).

A preliminary injunction should issue in the present case because Xcel is likely to prevail on its claims for copyright infringement and breach of contract, among others; due to the nature of the infringement, irreparable harm is presumed, and the balance of hardships tips in Xcel's favor because the integrity and value of its single largest asset are threatened. In light of its acts of infringement and breach of contract, Depot has no right to continue to reverse engineer, modify, or use Xcel's software.

### B. Xcel Is Likely To Succeed On The Merits Of Its Copyright Infringement Claim

Likelihood of success on the merits in a copyright action is established upon a showing of (1) proof of ownership of a valid copyright, and (2) copying of the work by the defendant. Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir., 2000), citing Lotus Dev. Corp. v. Borland Int'l., 49 F.3d 807, 813 (1st Cir., 1995); Feist Publications v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (U.S., 1991). For these purposes, creation of a derivative work has the same import as copying: "Copying is a 'shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. § 106..." Ford Motor Co. v. Summit Motor Products, Inc., 930 F.2d 277, 291 (3d Cir., 1991) (quoting Paramount Pictures v. Video Broadcasting Systems, 724 F. Supp. 808, 819 (D. Kan. 1989); see also 2 M. Nimmer, Nimmer on Copyright § 8.01[A] (1989) ("the grant of exclusive rights to the copyright owner certainly implies that the unauthorized exercise of such rights constitutes an infringement of copyright.")

#### 1. Xcel Owns A Valid Copyright

As noted, Xcel owns valid copyrights for its ServiceWorks software, including Registration No. TX 5 747-735 (issued in 2003) and Registration No. TXu 962-907 (issued in 2000). See Exhibit A. Copyright registration certificates "constitute prima facie evidence of the validity of the copyright." Micro-Sparc, Inc. v. Amtype Corp., 592 F. Supp. 33, 34 (D. Mass., 1984).

#### 2. Depot Has Prepared A Derivative Work

Ownership of a valid copyright vests certain exclusive rights in the owner, including the right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2); see also Patricia Kennedy & Co. v. Zam-Cul Enters., 830 F. Supp. 53,

55 (D. Mass., 1993) (copyright owner has exclusive right to prepare derivative works). This principle holds true when the subject of the copyright is computer software: "[Plaintiff] has a registered copyright for [its software program] and, therefore, has the exclusive right to exclude others from copying, making derivative works, distributing or using the program for a specified amount of time." AccuSoft Corp. v. Mattel, Inc., 117 F. Supp. 2d 99, 101 (D. Mass., 2000). Under the Copyright Act, "[a]nyone who violates any of the exclusive rights of the copyright owner...is an infringer of the copyright." Baystate Techs. v. Bentley Sys., 946 F. Supp. 1079, 1086 (D. Mass., 1996).

The Copyright Act defines "derivative work" as "[a] work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship." 17 U.S.C. § 101. Depot's elaboration upon and modifications of the ServiceWorks program, and specifically, the ServiceWorks database, constitutes creation of a derivative work. Depot's insertion of new code into that part of the ServiceWorks software which governed the database constituted a substantial alteration of the program, one easily sufficient to "represent an original work of authorship." It is well-established law that not much originality is required: "All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.'" Knickerbocker Toy Co., Inc. v. Winterbrook Corp., 554 F. Supp. 1309, 1317 (D. N.H. 1982) (finding creation of an unauthorized derivative work), quoting Bleistein v. Donaldson Lithographing Co., 23 S. Ct. 298 (1902). As one leading commentator summarizes it,

> In general, the applicable standard in determining the necessary *quantum* of originality is that of a "distinguishable variation" that is more than

11

"merely trivial." Any variation will not suffice, but one that is sufficient to render the derivative work distinguishable from its prior work in any meaningful manner will be sufficient.

3 M. Nimmer, Nimmer on Copyright, § 3.03[A] (1989). Depot's addition of an entirely new table with new functionality certainly constitutes a "distinguishable variation," and it thus created an illegal derivative work.

### C. Depot's Reverse Engineering Constitutes Both An Infringement Of Xcel's Copyright And A Breach Of Agreement One

#### 1. Depot's Reverse Engineering Constitutes Copyright Infringement

Depot granted itself access authorization to read and to modify the ServiceWorks program's database, then executed a function which revealed the full structure and logic of that database. In the First Circuit, such acts constitute reverse engineering:

> 'Reverse engineering' involves gaining access to the functional elements of a software program. Methods of reverse engineering include observing the program in operation, performing a static or dynamic examination of the individual computer instructions contained within the program, and using a program known as a disassembler to translate the binary machine-readable object code that runs on the computer into the human-readable words and symbols known as source code.

Microsystems Software, Inc. v. Scandinavia Online AB, 226 F.3d 35, 38 (1st Cir. 2000), citing Sony Computer Entertainment, Inc. v. Connectix Corp., 203 F.3d 596, 599-600 (9th Cir. 2000).

Here, Depot gained access to the functional elements of ServiceWorks by modifying the software to designate Depot's software architect as the owner and author of ServiceWorks' database; Depot next observed the program in operation, then executed an SQL function which revealed the full structure and logic of the ServiceWorks database, including all tables within the database, all of the fields in each table, and the

12

interrelationships between these fields. Such acts clearly fall within the definition of reverse engineering.

When a party reverse engineers a software program, it infringes the owner's copyright:

> To effectuate reverse engineering, it is typically necessary to engage in an act of reproduction **or adaptation** (or both) of the underlying computer program, and hence the elements of the *prima facie* case would appear to be present. **The fact that the user is lawfully in possession of the object code furnishes no defense to engage in such reproduction or adaptation**...Accordingly, it would seem that reverse engineering satisfies the elements for plaintiffs to prove copyright infringement. (Emphasis added.)

13 M. Nimmer, Nimmer on Copyright, Nimmer on Copyright § 13.05[D][4] (1989). Depot's acts of reverse engineering thus constitute a second breach of Xcel's copyright.

### 2. Depot's Reverse Engineering Also Constitutes A Breach Of Contract

Xcel also is likely to prevail on its claim for breach of Agreement One. To prevail, Xcel must prove three things: "(1) the existence of a valid agreement, (2) the breach of that agreement, and (3) damages resulting from the breach." Amcel Cor. v. Int'l. Exec. Sales, Inc., 1997 U.S. Dist. LEXIS 23543 at 19 (D. Mass. 1997) citing Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1122 (1st Cir. 1995).

#### (a). A Contract Existed Between Xcel And Depot

As discussed above, on or about February 1, 2002, Xcel and Depot first entered into Agreement One, and Depot subsequently has purchased more than 100 additional such licenses under this agreement. Any attempt by Depot to shirk its responsibilities under this agreement should be rejected, since clickwrap license agreements clearly are valid and enforceable. I. Lan Sys. v. Netscout Serv. Level Corp., 183 F. Supp. 2d 328, 338 (D. Mass., 2002) (enforcing clickwrap agreement of computer software company

13

because such agreements are "a practical way to form contracts, especially with purchasers of software"). Where the terms of a contract clearly state that reverse engineering is prohibited, the Court must enforce the wishes of the parties. Bowers v. Baystate Techs., 320 F.3d 1317, 1326 (Fed. Cir., 2003) (enforcing "shrinkwrap" contract software developer signed which prohibited reverse engineering). This is the case even when such agreements narrow the rights which might otherwise be available under the Copyright Act: "[C]ase law indicates the First Circuit would find that private parties are free to contractually forego the limited ability to reverse engineer a software product under the exemptions of the Copyright Act." Ibid.

### (b). Depot Breached The Contract

Agreement One explicitly states that:

> You may not reverse engineer, decompile, or disassemble the Licensed Software, transfer the Licensed Software to any third party, or use the Licensed Software to perform services for any third party. Any use or dealings with the Licensed Software other than as this Agreement expressly provides automatically terminates this Agreement.

On or about July 7, Xcel discovered that Depot had reverse engineered the ServiceWorks software in an attempt to program several new database features without the assistance of Xcel. Specifically, Depot granted itself access authorization to read and to modify the ServiceWorks program's database, then executed an SQL function which revealed the full structure and logic of the ServiceWorks database, including all tables within the database, all of the fields in each table, and the interrelationships between these fields. Such actions not only constitute reverse engineering, but also a "use" or "dealing with" the software other than as expressly permitted by Agreement One.

14

### (c). <u>Xcel Has Suffered Damages As A Result Of Such Breach</u>

As stated above, as a direct result of Depot's reverse engineering and extra-contractual use of and dealings with the ServiceWorks software, Xcel has suffered measurable financial loss: Depot's average monthly expenditures on ServiceWorks licenses, support and custom programming services have decreased by approximately 65 percent, and continue to decline. In the event that Depot is allowed to continue to reverse engineer the ServiceWorks software, those expenditures likely will evaporate entirely.

### D.    <u>As To Xcel's Copyright Claim, Irreparable Harm Is Presumed</u>

As stated above, copyright claims give rise to special presumption in favor of the plaintiff: "irreparable harm is usually presumed if likelihood of success on the copyright claim has been shown." <u>Concrete Machinery Co.</u> 843 F.2d at 612; <u>see also</u> <u>Flomerics Ltd.</u>, 880 F. Supp. at 61 (presuming irreparable harm in copyright infringement action if likelihood of success is high). Even if not presumed, however, the injury to Xcel is irreparable. Because Xcel's software code has been reverse-engineered, Depot can instantly transmit to third parties the inner workings of the ServiceWorks program; Depot can also much more readily create and distribute a competing work. Because Xcel's software has been modified and a derivative work has been created, Xcel has lost the ability to troubleshoot and accurately diagnose problems experienced by Depot (and potentially others) in operating the software. The irreparable nature of these injuries is further demonstrated by the lack of remedial measures available to Xcel: once the ServiceWorks software has been reverse engineered and its secrets discovered, Depot cannot "un-engineer" the software. Moreover, Depot's continued refusal to discontinue its use of the program indicates an intent to continue to infringe or to facilitate further

infringement, thereby perpetuating the irreparable harm to Xcel.

### E. The Balance Of Hardships Tips In Xcel's Favor

The balance of hardships tips in Xcel's favor because the only harm Depot risks suffering is economic and is based on its own illegal actions, whereas Xcel faces continued irreparable damage to its most valuable asset, an asset which has been literally decades in the making. Defendants no doubt will argue that loss of use of the ServiceWorks software would harm their business, but "where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration'." Concrete Machinery Co., 843 F.2d at 612 (quoting Helene Curtis Industries v. Church & Dwight Co., Inc., 560 F.2d 1325, 1333 (7th Cir. 1997)). Even if Depot America's business were to be virtually destroyed because it can no longer engage in its infringing use of Xcel's software, this Court must still give little equitable consideration to such damage. Accusoft Corp. v. Palo, 923 F. Supp. 290, 297 (D. Mass., 1996) (a nonmoving party's business being "virtually destroyed" bears little consideration when its business is based exclusively on the infringing activity); see also Fritz v. Arthur D. Little, Inc., 944 F. Supp. 95, 97 (D. Mass., 1996) (finding that "harm to the defendant flowing from an injunction where infringement appears likely is entitled to less consideration than other harms").

### F. The Court Must Presume That An Injunction Would Serve The Public Interest When There Is A Likelihood Of Success On The Copyright Claim

When a copyright owner demonstrates a likelihood of success on its claim, a presumption arises that by granting an injunction, the Court would be serving the public

16

interest. "Since Congress has elected to grant certain exclusive rights to the owner of a copyright, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." Concrete Machinery Co., 843 F.2d at 612 (quoting Klitzner Industries, Inc. v. H. K. James & Co., 535 F. Supp. 1249, 1258 (D. Pa., 1982)). See also AccuSoft Corp., 117 F. Supp. 2d at 102. (Plaintiff's having established a likelihood of success on copyright claim was enough to have a preliminary injunction be in the public interest). Because Xcel has a strong likelihood of success on its copyright infringement claim, issuance of a preliminary injunction would be in the public's interest.

### G.   The Court Should Grant A Preliminary Injunction.

Xcel has fully satisfied the requirements imposed by this Court for grant of a preliminary injunction. Xcel has demonstrated: (1) that it is likely to prevail on its claims for copyright infringement and breach of Agreement One, due to Depot's unauthorized acts of modification and reverse engineering; (2) that Xcel should be presumed to have been irreparably harmed by Depot's infringement of Xcel's copyright; (3) that the balance of hardships tips in Xcel's favor, due to the threatened loss of control over and damage to Xcel's most valuable asset; and (4) that the public interest would be served by issuance of an injunction affirming the importance of protecting Xcel's copyright.

### III.   SECURITY

In Agreement Two, Xcel and Depot agreed as follows:

Money damages will not be an adequate remedy if this Section 4 or
Sections 2 or 3 are breached and, therefore, XCEL shall, in addition to any

17

other legal or equitable remedies, be entitled to an injunction or similar equitable relief against such breach or threatened breach **without the necessity of posting any bond**. (Emphasis added.)

Exhibit D, § 4. As discussed above and in Plaintiff's First Amended Complaint, Depot has breached Sections 2.1 (no unauthorized modifications and no creation of derivative work), 2.2 (no reverse engineering) and 3 (no removal of copyright notice) of Agreement Two. The Court therefore should respect the wishes of the parties and waive the Rule 65(c) security requirement.

### IV.   REQUEST FOR ORAL ARGUMENT

In accordance with Local Rule 7.1(D), Plaintiff hereby requests that an oral argument be heard by the Court concerning the above-referenced matter.

Respectfully submitted,

Date: August 19, 2004

XCEL SOFTWARE, INC.,
By its attorney,

By: _____
Sean Ploen (BBO # 641279)
BOSTON LAW GROUP, LLP
20 Park Plaza, Suite 637
Boston, MA 02116
Tel. (617) 426-6800

## Certificate of Service

I, Sean Ploen, hereby certify that I have this day served a true copy of the above documents upon the opposing party by first-class mail to its counsel of record this nineteenth day of August, 2004.

Sean Ploen

**By First-Class Mail**
Charles P. Kennedy, Esq.
Lerner, David, Littenberg, Krumholz & Mentlik, LLP
600 South Avenue West
Westfield, NJ  07090-1487

**By First-Class Mail**
John Egan, Esq.
Posternak, Blankstein & Lund, LLP
800 Boylston Street
Boston, MA 02199-8004